UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

UNITED STATES OF AMERICA §
§
v. § CRIMINAL ACTION H-08-411
§
MARK DAVID RADLEY, *et al.,* §

### MEMORANDUM OPINION AND ORDER

The United States charges four former employees of BP America Inc. in the twenty-six count superceding indictment.  Defendants have filed four separate motions to dismiss the superceding indictment on three separate grounds (Dkts. 257, 259, 260, and 261).  The court held a hearing on these motions on July 2, 2009.  Having considered the motions, responses, arguments of counsel, and the applicable law, the court finds that all of defendants' motions should be granted.

### I. FACTUAL BACKGROUND

The following facts are alleged by the government in the superceding indictment (Dkt. 219).[1] Mark David Radley, James Warren Summers, Cody Dean Claborn, and Carrie Kienenberger are former employees of BP America Production Company, a subsidiary of BP America Inc. (collectively "BP").  Dkt. 219, superceding indictment, ¶ 4.  While employed at BP, defendants were assigned to the Integrated Supply & Trading group ("IST"), and were a part of the Natural Gas Liquids ("NGL") trading bench.  *Id.*   The NGL trading bench was responsible for trading natural

---

[1]In considering motions to dismiss for failure to state an offense, the court takes all allegations in the indictment as true.  *United States v. Kay*, 359 F.3d 738, 742 (5th Cir. 2004).

gas liquids, including Texas Eastern Transmission Corporation ("TET") propane, the commodity at issue in this case. *Id.*

Defendant Radley was the bench leader of the NGL trading bench, and his responsibilities included developing and overseeing trading strategies. *Id.* at ¶ 8. Defendant Summers was a Vice President of NGL Trading and Radley's supervisor. *Id.* at ¶ 9. Summers was also responsible for supervising and approving trading strategies. Defendant Claborn was the primary trader on the NGL trading bench responsible for trading TET propane during all relevant time periods. *Id.* at ¶ 10. Defendant Kienenberger was a trader in TET propane on the NGL bench during all relevant time periods. *Id.* at ¶ 11. Dennis Abbot, an unindicted BP employee, was also a trader on the NGL trading bench at the same time. *Id.* at ¶ 12. All defendants were commonly granted bonuses based on the trading profits of the NGL bench. *Id.* at ¶ 7.

TET propane is propane that is transported in the Texas Eastern Products Pipeline Company, LLC ("TEPPCO") interstate pipeline system. TET propane is a commodity as defined by the Commodities Exchange Act ("CEA"), and is used in the petrochemical industry to produce plastics and as a source of energy for residential and commercial heating. 7 U.S.C. § 1a(4); Dkt. 219 at ¶ 14. The NGL trading bench traded TET propane with other companies known as counterparties. *Id.* at ¶ 5. TET propane was predominately bought and sold "over-the-counter" in three ways: (1) directly between two parties, (2) through voice brokers, and (3) through an electronic trading platform known as Chalkboard. Voice brokers communicated information about bids, offers, and recent sales prices of TET propane. *Id.* at ¶¶ 16-17. Chalkboard transactions involved buyers and sellers posting anonymous bids and offers on Chalkboard's website. *Id.* at ¶ 18. Buyers and sellers were matched up and only learned each other's identity upon completing a transaction. *Id.* When a transaction was

2

completed on Chalkboard, the price associated with the transaction was published to all traders with access to Chalkboard. *Id.* However, the counterparties involved were not identified. *Id.*

Based on information collected from propane traders and voice brokers, prices of TET propane sales were published daily in the Oil Price Information Service ("OPIS"). *Id.* at ¶ 21. At the end of every trading day, OPIS published the highest and lowest priced transactions as well as the "OPIS average," the midpoint between the high and low transactions for that day. *Id.* at 22. OPIS published prices based on when the TET propane was to be delivered. A price outside of the range of recent transactions would likely affect the OPIS average for that day, and OPIS published prices had the potential to affect prices paid by traders and end users. *Id.* In fact, TET propane traders sometimes entered into contracts for future delivery based on the daily or monthly OPIS average price prevailing at the time of delivery. *Id.* at 23. Parties entering into an "OPIS average transaction" would not know the actual price to be paid at the time of execution. *Id.* Accordingly, a sale which affected the OPIS average would in turn affect the prices of any OPIS average transactions. *Id.*

TET propane was bought and sold by parties with different time periods for delivery. *Id.* at ¶ 19. When traders entered into an "any" contract, the seller was obligated to deliver TET propane to the buyer on or before the last calendar day of a month. *Id.* Defendants are charged in conjunction with their trading of February 2004 TET propane, propane required to be delivered on or before February 29, 2004. Specifically, the government alleges that they conspired to manipulate the price of February 2004 TET propane, corner the market for February 2004 TET propane, and defraud counterparties who purchased February 2004 TET propane based on the OPIS average price. *Id.* at ¶ 25.

The government generally alleges that defendants conspired to acquire dominance in the 2004 TET propane market and withhold a portion of the commodity from sale in order to artificially inflate the price. *Id.* at ¶ 26. This would enrich BP when it sold propane at artificially high prices and would increase the price for OPIS average transactions. *Id.* at ¶ 27. Defendants allegedly conspired to conceal their actions and enrich themselves by obtaining bonuses based on BP's profits generated from the sales of TET propane at artificially high prices. *Id.* at ¶¶ 28-29.

In order to execute their plan, defendants allegedly used BP's resources to buy contracts for delivery of large amounts of TET propane at the end of February, 2004, even though BP had no commercial need for TET propane. *Id.* at ¶ 31. These purchases of large quantities of February 2004 TET propane gave BP a dominant long position in TET propane, meaning that it would benefit if the cost of propane went up during the month because it would be entitled to buy it a previously negotiated lower price. In order to capitalize on this position, defendants allegedly set out to increase the price of TET propane. To do this, defendants allegedly misled the market about the true supply of February 2004 TET propane by presenting "show" offers designed to falsely convey that BP wished to sell propane and simultaneously present multiple bids to buy on Chalkboard, creating the impression that multiple counterparties wished to buy propane. *Id.* at ¶¶ 32-33. After achieving the desired price increase, defendants would then sell TET propane at the higher price and would also sell TET propane at the OPIS average price, which was also higher due to defendants' action. *Id.* at ¶¶ 37-38.

The government alleges the following overt acts that it claims were in furtherance of the conspiracy described above. At the beginning of February, 2004, defendant Radley and Dennis Abbot discussed their plans to execute a plan that would demonstrate that they could "control the

market at will." *Id.* at ¶ 39.  They also discussed how they would gain approval for the plan from

defendant Summers, which they subsequently obtained.  *Id.*  After gaining approval, Radley,

Claborn, and Abbot discussed implementation of the plan which included gaining a dominant long

position in February 2004 TET propane and then waiting until "some of these shorts come in," in

order to profit on the price increase. *Id.* at ¶ 41.  They also discussed how they could escape scrutiny

by incorporating the OPIS average price into their transactions because it would make it harder for

market watchers to determine whether a given price was artificial.  *Id.* at ¶ 72.

After some discussion, defendants then began actual trading of February 2004 TET propane.

On February 9, 2004, Claborn purchased 150,000 barrels of TET propane, to be delivered before

February 19, 2004 at a price of 61 cents per gallon.  *Id.* at ¶ 43.  Two days later, Abbott purchased

an additional 100,000 barrels, to be delivered by the same date, for 64 cents per gallon.  *Id.*  On

February 23, 2004, Claborn posted an anonymous offer on Chalkboard to sell February 2004 TET

propane at 76.75 cents per gallon even though the most recent transaction was for 75 cents per

gallon, and there was one offer pending for 76.5 cents per gallon.  *Id.* at ¶ 44.

Around the same time, defendants and others began concealing their plan and agreed not to

use words such as squeeze, leverage, or corner.  *Id*. at ¶ 45.  When other traders began questioning

BP's motives in purchasing so much propane, Claborn stated that BP would be "consuming it at

some point," and that other traders alleging an attempted corner by BP were "badly mistaken."  *Id.*

at ¶¶ 47-48.

Between February 19 and February 24, 2004, defendants and other BP traders continued to

purchase contracts for delivery of additional barrels of TET propane.  *Id.* at ¶ 49.  During that time,

BP traders made at least eight purchases of propane ranging in quantity from 2,500 to 25,000 barrels

5

and steadily increasing in price from 69.625 cents to 82.25 cents per gallon. *Id.* On February 23, 2004, defendants and other traders discussed several industry articles which indicated BP was engaged in a "short squeeze." They also discussed the risk of discovery if they continued with their plan. *Id.* at ¶¶ 50-51. After discussion, Summers told them to "go make money," and that any "reputational risk" to BP was already a "sunk cost." *Id.* at ¶ 52.

The government alleges that beginning on February 20, 2004, defendants agreed not to make any offers to sell February 2004 TET propane to any counterparties. *Id.* at ¶¶ 53-54. Beginning on February 23, 2004, defendants began posting bids to buy TET propane on Chalkboard. *Id.* at ¶ 57. The bids steadily increased over a period of three days from 60 cents to 89.125 cents per gallon, and then dropped to 84 cents per gallon. *Id.* at ¶¶ 57-59. At the time of each bid, it was the highest bid on Chalkboard, and there were often multiple, or "stacked" bids entered by BP traders at the same time. *Id.* The government alleges that this series of bids was intended to prevent other market participants from entering into transactions at lower prices, force market participants to pay BP a higher price, deceive market participants about the actual demand for TET propane, and permit BP to profit when it sold TET propane based on the OPIS average price. *Id.*

On February 25, 2004, defendant Claborn purchased February 2004 TET propane from a counterparty and declined a discount offered to him unless the counterparty agreed not to communicate the price to other market participants. *Id.* at ¶ 58. On February 27, 2004, defendant Radley posted offers to sell March 2004 TET propane in order to signal that the prices of March and February TET propane would not converge. *Id.* at ¶ 61. The culmination of defendants' plan allegedly occurred near the end of the month when defendants sold February 2004 TET propane at prices ranging from 92.5 to 94 cents per gallon.

The government also alleges that defendants tried to conceal their actions from BP management and others. *Id.* at ¶¶ 66-69.  They did this by reclassifying over 3 million barrels of February 2004 TET propane as March 2004 TET propane in BP's inventory system.   According to the government, all of these actions formed a conspiracy to violate federal commodities trading laws. *See* 7 U.S.C. § 13(a)(2).

## II. THE INDICTMENT

The superceding indictment brings twenty-six counts against all four defendants based on the facts outlined above.  Count One is a conspiracy count alleging that the defendants conspired with each other to manipulate and corner the February 2004 TET propane market in violation of the CEA.  Counts Two through Twelve are price manipulation and attempted price manipulation counts.  These eleven counts are based on eleven separate transactions in which defendants communicated a price to a counterparty which the government alleges was a manipulated price.  Counts Thirteen through Seventeen are also price manipulation and attempted price manipulation counts.  However, the bases of these five counts are the OPIS average prices for each day from February 23, 2004 through February 27, 2004.  According to the government, the OPIS price on each day was an artificial price set by defendants' manipulation.  Counts Eighteen and Nineteen are corner and attempted corner counts.  The two counts are based on two different time periods.  Count Eighteen alleges that defendants cornered the market for February 2004 TET propane between February 5, 2004 and February 24, 2004.  Count Nineteen alleges that they cornered the market again from February 25, 2004 through February 27, 2004.  Counts Twenty through Twenty-Six are wire fraud counts.  They allege seven wire transfers made from various counterparties to BP in satisfaction of contracts selling TET propane based on the manipulated OPIS average price.

### III. ANALYSIS

#### A.    CEA SECTION 2(G) EXCLUSION[2]

The superceding indictment alleges violations of the CEA (the "Act"), which prohibits price

manipulation and cornering of commodities in interstate commerce.  7 U.S.C. § 13(a)(2).  However,

Section 2(g) excludes certain agreements, contracts, and transactions from coverage by the Act.

Defendants argue that Section 2(g) covers the actions described in the superceding indictment and

that the Act is therefore inapplicable.  The court agrees.

Section 2(g) of the Act states that:

> No provision of this chapter (other than section 7a (to the extent
> provided in section 7a(g) of this title), 7a-1, 7a-3, or 16(e)(2) of this
> title) shall apply to or govern any agreement, contract, or transaction
> in a commodity other than an agricultural commodity if the
> agreement, contract, or transaction is–
>
> (1) entered into only between persons that are eligible contract
> participants at the time they enter into the agreement, contract, or
> transaction;
>
> (2) subject to individual negotiation by the parties; and
>
> (3) not executed or traded on a trading facility.

7 U.S.C. § 2(g).  Section 2(g) is part of the Commodity Futures Modernization Act of 2000

("CMFA").  The goal of the CMFA's drafters was to bring certainty to over-the-counter ("OTC")

futures markets so that they did not relocate internationally.  *See* 146 Cong. Rec. H12442-03 (daily

ed. Dec. 15, 2000).

---

[2]Defendants' motions are addressed in the order most amenable to analysis, not the order in which they were filed with the court.

The parties agree that TET propane is a "commodity other than an agricultural commodity," and that BP and all involved counterparties were "eligible contract participants."[3] The parties disagree on (1) whether defendants' actions constituted agreements, contracts, or transactions, (2) whether each "agreement, contract, or transaction" was individually negotiated by the parties, and (3) whether Chalkboard is a trading facility.

### 1.    Agreement, Contract, or Transaction

The government argues that defendants' actions are not covered by Section 2(g) because they do not constitute an "agreement, contract, or transaction." In support of this argument, the government cites several cases in which trading activity was not exempt because it did not fall within the meaning of the phrase. In *Commodity Futures Trading Com'n v. Johnson*, 408 F. Supp. 2d 259 (S.D. Tex. 2005), the defendants allegedly "delivered. . . inaccurate market information as well as entirely fictitious purported gas trades and/or failed to include actual natural gas trades made by themselves." *Johnson*, 408 F. Supp. 2d at 266. In holding that Section 2(g) did not apply to defendants' activities, the court found that these reporting activities were not contracts, agreements, or transactions, which assume "mutual exchanges between parties creating rights or obligations that are enforceable at law." *Id.* at 271. Defendants' actions in this case are not analogous to the actions alleged in *Johnson*. Here, defendants' means of alleged price manipulation and cornering involved actual bids and offers, some of which were accepted. In all cases, the bids and offers would have

---

[3]"Eligible contract participant" is defined in 7 U.S.C. § 1a(12). Eligible contract participants include corporations with "total assets exceeding $10,000,000" or "a net worth exceeding $1,000,000" which "enter[] into an agreement, contract, or transaction in connection with the conduct of the entity's business or to manage the risk associated with an asset or liability owned or incurred or reasonably likely to be owned or incurred by the entity in the conduct of the entity's business."

created legally enforceable obligations if accepted.  This was confirmed by the government's attorney, who stated during the hearing that, "they are actual prices associated with actual transactions."  Even so, every case relied on by the government deals with reporting activity, not actual trading activity.  *See U.S. v. Futch*, 278 Fed. Appx. 387 (5th Cir. 2008); *U.S. Commodity Futures Trading Com'n v. Atha*, 420 F. Supp. 2d 1373 (N.D. Ga. 2006); *U.S. Commodity Futures Trading Com'n v. Bradley*, 408 F. Supp. 2d 1214 (N.D. Okla. 2005). Since there is no allegation that defendants falsely reported transactions which did not actually occur or failed to report transactions that did occur, the government's supporting authorities are inapposite

The government alternatively argues that once the transactions were reported on Chalkboard and communicated to other Chalkboard subscribers, the wrongdoing went beyond mere transacting because communications do not fall within the meaning of "agreement, contract, or transaction." The accurate communication of a transaction which actually occurred is not the type of reporting covered by the courts' decisions in *Futch*, *Atha*, *Bradley*, and *Johnson*, which all deal with reporting of fictitious transactions.  If the 2(g) exception is inapplicable to any transaction once it is communicated to others, a transaction must be kept secret in order to qualify for the protection of Section 2(g).  There is no indication in the statutory language or legislative history that Congress intended this outcome.  Moreover, this interpretation of the statute would stifle communication within the market and thwart the goal of providing legal certainty to parties entering into the transactions described in the statute.  Accordingly, the court finds that the factual allegations contained in the superceding indictment all constitute agreements, contracts, or transactions.

**2.      Individual Negotiation by the Parties**

10

The government also argues that the transactions at issue were not subject to individual negotiation by the parties.  In support, the government makes two points.  The first is that since contracts for purchase of TET propane have standardized terms for delivery location, quality specifications, delivery date, prices, and volumetric measurement, they cannot be negotiated to suit the individual needs of the contracting parties.  The second argument is that since TEPPCO standards governed delivery times, quality specifications, and physical transfers, these terms were not negotiated "by the parties," but dictated by a third-party.

These arguments are unavailing.  First, a contract can be subject to negotiation, even if some of the terms are predetermined. BP's contracts for TET propane had negotiated financial, credit, and legal terms, but they did include standard terms for delivery location and quality specifications.  Dkt. 276 at 49; Dkt. 290 at 5.  Most contracts for delivery of a commodity will have some of the terms predetermined.  Once a party has decided which commodity it would like to purchase, the quality specifications for that particular quantity as well as the place for delivery will often already be set. The fact that those terms are the same in any contract for a given commodity cannot make a contract ineligible for the protection of Section 2(g).  If it did, the exception would be so narrow that it would not bring the desired certainty to the market.

In considering similar language, the CFTC has stated that "[t]he Commission is aware that the terms regarding the quality and location of Energy Contracts, as well as other conventions surrounding their trading are standardized.  Nevertheless, these transactions can be distinguished by the fact that, because their credit terms are individual to the counterparties, they are not fungible and are created through the direct negotiation of the parties to the transaction."  CFTC Final Order Re:

Exemption for Certain Contracts Involving Energy Products, 58 Fed. Reg. 21,286, 21,291 (April 20, 1993). This finding is equally applicable to the contracts here.

The government's second argument, that the involvement of TEPPCO means that the terms were not negotiated "by the parties," is also unpersuasive. TEPPCO is the pipeline and transmission center owner and operator. A third-party, such as TEPPCO, will be involved in most commodity transactions since the counterparties will rarely own the means of transportation and delivery for that commodity. The involvement of a third-party is entirely consistent with a contract that has been negotiated between the parties. To suggest otherwise would essentially require counterparties to own the means of delivery and distribution for any commodity they are trading in order to benefit from the 2(g) exception. The court finds that, despite the existence of some standard terms, the contracts at issue were individually negotiated between the parties.

**3.      Trading Facility**

Having determined that the contracts were individually negotiated, the court now considers whether they were executed on a trading facility. Transactions entered into directly between two parties or through voice brokers were not executed on a trading facility. The only transactions the government argues were executed on a trading facility were entered into through Chalkboard. If Chalkboard is a trading facility, the transactions are not covered by Section 2(g).

The CEA defines a trading facility as:

> (A). . . a person or group of persons that constitutes, maintains, or provides a physical or electronic facility or system in which multiple participants have the ability to execute or trade agreements, contracts, or transactions–

> (I) by accepting bids or offers made by other participants that are open to multiple participants in the facility or system; or

> (ii) through the interaction of multiple bids or multiple offers within a system with a pre-determined non-discretionary automated trade matching and execution algorithm.
>
> (B) Exclusions
>
> The term "trading facility" does not include–
>
> (I) a person or group of persons solely because the person or group of persons constitutes, maintains, or provides an electronic facility or system that enables participants to negotiate the terms of and enter into bilateral transactions as a result of communications exchanged by the parties and not from interaction of multiple bids and multiple offers within a predetermined, nondiscretionary automated trade matching and execution algorithm

7 U.S.C. § 1a(34).  Chalkboard falls under the (B)(I) exclusion.   As noted above, the contracts between BP and counterparties were subject to individual negotiation.  Since Chalkboard enabled parties to "negotiate the terms of and enter into bilateral transactions," it is covered by the exclusion.  This characterization of Chalkboard is confirmed in the government's own documents.  Attached to the CFTC's Complaint filed against BP Products North America is a glossary which includes a definition of Chalkboard.  It states that "Chalkboard is an electronic bulletin board that provides a means for propane traders to engage in bilateral negotiations."  Dkt. 260, Ex. P.  The court agrees with the government's description of Chalkboard and finds that this description falls within the 1a(34)(B)(I) exclusion.  Accordingly, Chalkboard is not a trading facility.

Since the transactions alleged in the superceding indictment meet all three requirements of Section 2(g), they are not covered by the CEA, and all of the charges brought pursuant to the CEA (Counts Two through Nineteen) must be dismissed.  Since the CEA does not cover the transactions at issue, Count One, which alleges a conspiracy to violate the CEA, must also be dismissed since the goal of the conspiracy is not actually a violation of the CEA.

13

B.   VAGUENESS

### 1.   Vagueness Doctrine

Even if the charges in the superceding indictment were not precluded by the Section 2(g) exclusion, Counts Two through Seventeen must be dismissed because the term "manipulation," as used in the CEA is vague as it is applied to the allegations in this case. As stated in *U.S. v. Harriss*, 347 U.S. 612, 617, 74 S. Ct. 808, 812 (1964),

> [t]he constitutional requirement of definiteness is violated by a criminal statute that fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute. The underlying principle is that no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed.

"The threshold inquiry in any vagueness challenge is whether to scrutinize the statute for intolerable vagueness on its face or whether to do so only as the statute is applied in a particular case." *Reliant*, 420 F. Supp. 2d at 1054 (citing *U.S. v. Doremus*, 888 F.2d 630, 634 (9th Cir. 1989)). Defendants argue that the statute is vague as applied in this case. More specifically, they argue that when confronted with the facts alleged in the superceding indictment, a person of ordinary intelligence would not be able to determine that they constitute price manipulation under the CEA.

### 2.   Elements of Manipulation

The CEA makes it unlawful for "any person to manipulate or attempt to manipulate the price of any commodity in interstate commerce," but does not define the term "manipulate." At the time the CEA was enacted, Webster defined manipulation as "to manage or treat artfully or fraudulently." *U.S. v. Reliant Energy Servs.*, 420 F. Supp. 2d 1043, 1056 (N.D. Cal. 2006) (citing *Webster's New Int'l Dictionary* 1496 (2d ed 1934)). Courts and the CFTC have broadly defined price manipulation

14

in the civil context as the "intentional exaction of a price determined by forces other than supply and demand." *Frey v. CFTC*, 931 F.2d 1171, 1175 (7th Cir. 1991); *accord In re Abrams*, No. 88-10, 1994 WL 506250, *10 (CFTC 1994). In keeping with these definitions, courts have established four elements necessary to prove manipulation: "(1) the defendant[s] possessed the ability to influence prices, (2) an artificial price existed, (3) the defendant[s] caused the artificial price, and (4) the defendant[s] specifically intended to cause the artificial price." *Reliant*, 420 F. Supp. 2d at 1056 (citing *In re Soybean Futures Litigation*, 892 F. Supp. 1025, 1044 (N.D. Ill. 1995)); *see also Frey*, 931 F.2d at 1175.

### a.        Ability to Influence Price

The superceding indictment sufficiently alleges the first element–that the defendants possessed the ability to influence prices. The crux of the government's case is that the defendants, through their association with BP, had such vast resources that they could affect the price of TET propane by making large movements in the market. Dkt. 219, ¶ 3. In support, the government cites numerous transactions at escalating prices and attributes this increase in price to defendants' actions. *Id.* at ¶ 59. These allegations, if true, certainly show that defendants had the ability to affect the price of TET propane, and a person of "ordinary intelligence would understand" that the behavior alleged is sufficient to establish the first prong of the manipulation definition.

### b.        Existence of an Artificial Price

The second prong of the manipulation definition requires more analysis. In order to survive defendants' vagueness challenge, the government must also allege facts that undoubtedly show that an artificial price existed or that defendants attempted to establish a price that was artificial. The government fails in this regard because the definition of "artificial" is uncertain, and that uncertainty

makes application of the manipulation statute unconstitutionally vague as applied to the facts of this case.

The CFTC has explained the concept of price artificiality as follows:

> [T]o determine whether an artificial price has occurred, one must look at the aggregate forces of supply and demand and search for those factors which are extraneous to the pricing system, are not a legitimate part of the economic pricing of the commodity, or are extrinsic to that commodity market.  When the aggregate forces of supply and demand bearing on a particular market are all legitimate, it follows that the price will not be artificial.  On the other hand, when a price is effected by a factor which is not legitimate, the resulting price is necessarily artificial.

*Reliant*, 420 F. Supp. 2d at 1058 (citing  *In re Indiana Farm Bureau*, No 75-14, 1982 WL 30249, *35 n. 2 (CFTC 1982)).  This conception of price artificiality, one that focuses on supply and demand, is closely paralleled by the definition of manipulation used by the Eighth Circuit which stated that the test for manipulation "must largely be a practical one. . . The aim must be therefore to discover whether conduct has been intentionally engaged in which has resulted in a price which does not reflect basic forces of supply and demand."  *Cargill Inc. v. Hardin*, 452 F.2d 1154, 1163 (8th Cir. 1971); *see also Frey*, 931 F.2d at 1171 (defining manipulation as "an intentional exaction of a price determined by forces other than supply and demand").

The question then becomes–has the government alleged behavior clearly outside of the "legitimate" forces of supply and demand?  In the July 2nd hearing, the government stated that "the legitimate force[s] of supply and demand are people that produce the propane and people that consume the propane.  That's really all it is."  Tr. at 28.  If this is true, any activity in a market by parties other than producers or consumers would not be a legitimate force of supply and demand.  This notion is without support in the law and in the marketplace.  Today's markets are filled with

16

speculators attempting to make profits based on movement in prices of commodities and other products with no intention of ever consuming or producing them.  That is what the defendants were doing in this case, and there is no law or case which prohibits speculation.  The actual market that defendants were trading in was the market for contracts for future delivery of TET propane.  It is that market that the court will consider in determining whether defendants' alleged actions could fairly be called something other than legitimate forces of supply and demand.

The government implies that the defendants' actions were improper by repeatedly stating that BP had no "legitimate commercial purpose" for trading in TET propane contracts. Dkt. 276 at 8-10. BP's purpose in trading TET propane contracts was to make a profit based on movements in the price of TET propane.  Making a profit is a legitimate commercial purpose, and is in fact the exclusive purpose of most corporations.  It is not a requirement that an entity be interested in consuming TET propane before it makes a purchase.  This simplified view of the market and of commercial motivations is not supported by the law.  The government did not provide, and the court has not found any case holding that a party must consume the product on which it speculates in order to avoid criminal prosecution.

The government next implies that defendants' actions were not legitimate because they "took substantial pains to conceal from other market participants as well as BP management not involved in the scheme, the truth about their purchasing of TET propane." Dkt. 276 at 10.  Even though the government alleges specific instances of defendants attempting to conceal their actions, it never alleges that defendants lied about their activity.  Mere concealment is not sufficient to show that their actions were not legitimate forces of supply and demand.

17

As noted above, most of the government's arguments regarding price artificiality center on the implications created by reference to deception and questionable motives. While these implications can be used to impeach a party's credibility, the actions which support the implications are not actually illegal. While they could be capitalized on in front of a jury, they do not support an indictment, which must plead unquestionably criminal acts.

The government's strongest argument in support of the manipulation and attempted manipulation counts is based on defendants' actual trading activity. Dkt. 276 at 11. The government alleges that defendants repeatedly posted bids on Chalkboard for the highest prevailing price. Since other parties accessing Chalkboard considered these bids when determining their offers and bids, the "best bids" had the effect of increasing the price of TET propane. The government also alleges that defendants placed "stacked bids" on Chalkboard. Stacked bids are multiple bids placed at the same time. The government alleges that this was done in order to give the impression that more than one person desired to purchase TET propane. The impression created by the presence of "best bids" and "stacked bids" allegedly caused the price of TET propane to increase artificially. Finally, the government alleges that defendants withheld TET propane from the market, which also caused the price to increase.

While these facts do successfully allege an increase in price, they fall short of alleging an **artificial** price because none of these bidding tactics is anything other than legitimate forces of supply and demand. Only one court has written a published opinion considering whether certain trading activities constituted criminal violations of the CEA. *Reliant*, 420 F. Supp. 2d 1043. The *Reliant* court held that:

18

> Whether a particular market force is "legitimate" might be debatable in any given case, especially those involving schemes where the alleged manipulation is effected solely by the defendant's power and position in the market. But, in the context of an as-applied challenge, defendants cannot invoke the uncertainty that may exist at the periphery of commodities manipulation theory when their alleged conduct is unquestionably encompassed by the concepts of price manipulation and price artificiality. The dissemination of false information into a commodities market has long been recognized as a form of price manipulation.

*Reliant*, 420 F. Supp. 2d at 1058. This case is "at the periphery." The scheme alleged in the superceding indictment was "effected solely by the defendant[s'] power and position in the market." In *Reliant,* the defendants communicated false statements to the market when they lied about the availability of certain power plants for power generation. The superceding indictment does not allege a single lie or misrepresentation. The "best bids," even if they were higher than any others, were actually bids, and when they were accepted, defendants actually went through with the transactions. Other counterparties may have assumed that the "stacked bids" came from multiple parties, but defendants did not perpetuate or cause this misconception.[4] Since defendants were willing and able to follow through on all of the bids, they were not misleading.

The final allegation regarding trading activity is defendants' withholding of TET propane from the market. This language is somewhat misleading, since all of the other allegations in the superceding indictment show that BP never actually had any physical supply of TET propane. The court assumes that the government is referring to BP's unwillingness to enter into contracts for future sale of TET propane. Either way, the "withholding" was not fraudulent. Absent a contract

---

[4]Defendants argue that stacked bids are common when one purchaser wants to purchase a large quantity of a particular commodity but suspects that there is not a single seller that could fulfill the order. July 2, 2009 Hr'g Tr. at 51.

obligation or statutorily imposed position restriction, neither of which was present in this case, a party is never required to sell or purchase anything.  To refuse to do so is not misleading or fraudulent, regardless of the motivation.

Since defendants have not been accused of making false or misleading statements, the effect of their actions on the market was part of the legitimate forces of supply and demand.  Large market participants, like BP, are market participants nonetheless.  Their individual supply and demand are part of the aggregate, and it is axiomatic that their actions will affect the price of a commodity. Acting in a manner that shifts the price of a commodity in a favorable direction is the business of profit-making enterprises, and if it is done without fraud or misrepresentation, it does not clearly violate the CEA.[5]

The government has cited language from *CFTC v. Enron Corp.*, 2004 WL 594752, *6 (S.D. Tex. Mar. 10, 2004), that is at odds with this conclusion.  In the *Enron* case, the court stated that:

> whenever a buyer on the Exchange intentionally pays more that he has to *for the purpose of causing* the quoted price to be higher than it would otherwise have been. . ., the *resultant price is an artificial price* not determined by the free forces of supply and demand on the exchange.

*Enron*, 2004 WL 594752, *6 (quoting *In re Henner*, 30 S.D. 1151, 1198 (Agric. Dec. 1971)).  When quoted alone, this statement is taken out of context.  In the very next paragraph, the *Enron* court quotes another case stating that "there is no universally accepted measure or test of price

---

[5]This conclusion is supported by the analysis of courts applying the Securities Exchange Act ("SEA")  to claims of manipulation in securities markets.  *See Schreiber v. Burlington Northern, Inc.*, 472 U.S. 1, 12, 105 S. Ct. 2458 (1985) (holding that "manipulative" in the context of the SEA requires misrepresentation or nondisclosure); *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 199, 96 S. Ct. 1375 (1976) (stating that the word "manipulative" in the SEA "connotes intentional or willful conduct designed to deceive or defraud investors").

artificiality." *Enron*, 2004 WL 594752, *6 (quoting *In re Soybean*, 892 F. Supp. at 1057). This uncertainty is the very thing that the constitutional vagueness doctrine is meant to protect against. A reading of *Reliant*, *Enron*, and other manipulation cases, requires a finding that the conduct alleged here has never been clearly prohibited as causing an artificial price. Accordingly, the government has not pleaded facts regarding the existence of an artificial price that can sustain defendants' vagueness challenge.

### c.      Causation and Intent

The third and fourth elements of a manipulation offense are that the defendant in fact caused and intended to cause an artificial price. Although the government has alleged that defendants caused and intended to cause an increase in the price, it has not adequately alleged that the increased price was artificial. Accordingly, it has not alleged the third and fourth elements of a manipulation charge. All of the manipulation and attempted manipulation counts against all of the defendants must be dismissed.

## C.     FAILURE TO ALLEGE OFFENSE OF CORNERING

The court has already determined that defendants' actions are not covered by the CEA. However, even if they were, the charges of cornering must be dismissed because the government has failed to allege the elements of a corner. As with "manipulation," the term "corner" is not defined in the CEA, so its definition has been left to the courts. "A corner occurs when a trader secretly acquires a long futures position, very large relative to the physical supply that is available to be delivered, and simultaneously acquires the means, by ownership or otherwise, to prevent delivery at reasonable prices of the physical commodity." *U.S. v. Radley*, 558 F Supp. 2d 865, 874 (N.D. Ill. 2008) (citing *Zimmerman v. Chicago Bd. of Trade*, 360 F.3d 612, 616 (7th Cir. 2004)); *see also U.S.*

*v. Patten*, 226 U.S. 525, 539-40, 33 S. Ct. 141 (1913) (stating that "running a corner consists, broadly speaking, in acquiring control of all or the dominant portion of a commodity, with the purpose of artificially enhancing the price; one of the important features of which. . . is the purchase for future delivery, coupled with a withholding from sale for a limited time"); *Cargill Inc. v. Hardin*, 452 F.2d 1154, 1162 (8th Cir. 1971) (stating that "a corner amounts to nearly a monopoly of a cash commodity, coupled with the ownership of long futures contracts in excess of the amount of that commodity, so that shorts-who because of the monopoly cannot obtain the cash commodity to deliver on their contracts-are forced to offset their contract with the long at a price which he dictates"); *In re Soybean*, 892 F. Supp. 1025, 1034 (stating that "a party is said to 'corner' a market when it has a net long position and owns all or substantially all of the deliverable supply of a particular commodity").

The government successfully alleges that BP had a large long position in February 2004 TET propane, meaning that it would profit if the price of propane increased. However, there has never been an allegation that BP held a substantial portion of the physical supply of TET propane. The government does not dispute this. Hr'g Tr. at 63-64. Instead, the government argues that it does not have to show ownership of the physical supply and argues that BP's long position actually constituted control over the physical supply even though BP did not own that supply. In support of this argument, the government cites the *Enron* case as stating "[h]istorically, a corner could be performed solely through the purchase of long contracts in excess of the known deliverable supply, through the purchase of the entire cash supply, or through a combination of both." *Enron*, 2004 WL 594752 at *5 (citing *Great Western Food Distributors, Inc. v. Brannan*, 201 F.2d 476, 478-79 (7th Cir. 1953)). Despite this language, the *Enron* court (which issued its decision after the events

22

underlying the superceding indictment) actually applies the more recent two-prong test from *Cargill*. In *Cargill*, the corner was accomplished by gaining a dominant long position in wheat while simultaneously holding nearly the entire physical supply of wheat.  It is the holding of physical supply that is absent in this case.

The government tries to avoid confronting this missing element by repeatedly stating that BP had control over the physical propane market **because of** its dominant long position.  The contractual right to future control of a commodity is simply not the same as present control over the physical supply.  The government's argument impermissibly collapses the two elements of a corner into one, making the requirement of physical control meaningless.  This simplification is not in line with case law interpreting the elements of a market corner.  Where case law interpretation of statutorily undefined terms requires two elements, the government must allege both of those elements in the indictment.  Since the government has not, it has not adequately alleged the elements of a corner, and those counts must be dismissed.

## D.    MULTIPLICITY

Defendants also move to compel election of certain counts because they are multiplicitous. Counts two through seventeen allege price manipulation, and counts eighteen and nineteen both allege cornering.  Defendants argue that the government should be ordered to elect one count from each category on which to proceed.  Dkt. 259.  Although the court has already determined that the manipulation and cornering counts should be dismissed, it has considered the multiplicity argument and finds that it is meritorious.  If the counts had survived the previously analyzed motions, the court would order that all counts except one manipulation count and one cornering count be dismissed.

An indictment is multiplicitous if it charges the same crime in more than one count. An indictment that brings multiplicitous counts allows a jury to convict the defendant on more than one count and subjects him to two punishments in violation of the double-jeopardy clause. *U.S. v. Smith*, 591 F.2d 1105, 1108 (5th Cir. 1979); *U.S. v. Brechtel*, 997 F.2d 1108, 1112 (5th Cir. 1993). Multiplicitous indictments may also result in adverse psychological effects on the jury by suggesting that several crimes have been committed and allowing for the possibility of a compromise verdict. *Id.*

In deciding whether an indictment is multiplicitous, courts look to "whether separate and distinct prohibited acts, made punishable by law, have been committed." *U.S. v. Shaid*, 730 F.2d 225, 231 (5th Cir. 1984). To make this determination, the court must consider the "allowable unit of prosecution," which is the *actus reus* of the defendant. *U.S. v. Reedy*, 304 F.3d 358, 365 (5th Cir. 2002); *U.S. v. Prestenback*, 230 F.3d 780, 783 (5th Cir. 2000). "The test for determining whether the same act or transaction constitutes two offenses or only one is whether conviction under each statutory provision requires proof of an additional fact which the other does not." *Reedy*, 304 F.3d at 363. "Where a multi part transaction raises the prospect of multiplicity under a single statute, the question becomes whether separate and distinct prohibited acts, made punishable by law, have been committed." *U.S. v. Buchanan*, 485 F.3d 274, 278 (5th Cir. 2007). The court finds that they have not.

All reported cases of price manipulation have been charged in one count, even when the manipulation was caused by the interaction of numerous transactions. This includes the civil case against BP for the scheme outlined in the superceding indictment as well as the *Reliant* case, the only other criminal prosecution under the CEA. *CFTC v. BP Products North America, Inc.*, 06-CV-3503

(N.D. Ill. 2006); *Reliant*, 420 F. Supp. 2d 1043; *see also In re Diplacido*, No. 01-23, 2008 WL 4831204 (CFTC Nov. 5, 2008) (ordering civil penalties for four occasions of manipulation over a period of four months, rather than for each transaction that made up the manipulation); *CFTC v. Reed*, 481 F. Supp. 2d 1190, 1200 (N.D. Colo. 2007) (complaint alleged a single scheme from May 2000 to the summer of 2002); *CFTC v. Delay*, No. 7:05-CV-5026, 2006 U.S. Dist. LEXIS 85068 (D. Neb. Nov. 17, 2006) (complaint alleged one charge in a case where there were five transactions that made up the scheme); *CFTC v. Atha*, 420 F. Supp. 2d 1373 (N.D. Ga. 2006) (citing a single scheme in a case that alleged several false reports); *CFTC v. Johnson*, 408 F. Supp. 2d 259, 268 (S.D. Tex. 2005) (alleging one count of manipulation for conduct occurring over several months involving multiple instances of false reporting).

Perhaps for this very reason, there are no cases that address multiplicity in the context of the CEA.[6] However, the concept has been discussed as it relates to manipulation under the SEA. The SEA prohibits manipulation of securities prices, and the Securities and Exchange Commission has stated that

----

[6]The government cites two CEA cases allegedly in support of its argument. *Cargill*, *Inc. v. Hardin*, 452 F.2d 1154, 1164 (8th Cir. 1971) states that "[i]f [a] single dominant long does in fact exact an artificial price for his single contract–and the Government can prove it–this would constitute price manipulation in violation of the Act." The government attempts to expand the court's holding substantially. While the court did hold that a single transaction can constitute manipulation, it did not hold that every transaction in a manipulative scheme is itself a separate instance of manipulation. In fact, it appears that Cargill's actual behavior consisted of many transactions charged as one scheme.

The government also cites to *Volkart Bros., Inc. v. Freeman*, 311 F.2d 52, 58 (5th Cir. 1962), which states that "manipulation is any and every operation or transaction or practice . . . calculated to produce a price distortion of any kind in any market either in itself or in relation to other markets." Again, the quote is taken out of context. The *Volkart* court was considering different **types** of alleged manipulation, not individual transactions which were all intended to manipulate the price of the commodity.

> proof of a manipulation is generally not based on a single activity, but rather on a course of conduct showing an intentional interference with the normal functioning of the market for a security.   Indeed, manipulation is usually the result of acts, practices, and courses of conduct that deceive the marketplace.

*In re Richard D. Chema*, No. 3-8508, 1995 SEC LEXIS 2184 (SEC Aug. 24, 1995).   In *In re Pagel,*

*Inc.*, No. 3-6142, 1985 SEC LEXIS 988, * 7-*8 (SEC Aug. 1, 1985), the SEC stated that:

> [p]roof of a manipulation almost always depends on inferences drawn from a mass of factual detail.  Findings must be gleaned from patterns of behavior, from apparent irregularities, and from trading data. When all of these are considered together, they can emerge as ingredients in a manipulative scheme designed to tamper with free market forces.

The government argues that this language should not be applied to cases brought under the CEA because the SEA specifically prohibits execution of a manipulative "series of transactions," while the CEA lacks such a distinction.  15 U.S.C. § 78i(a)(2).  However, the language of the CEA, though different, leads to the same conclusion.  The CEA makes it a crime for "any person to manipulate or attempt to manipulate the price on any commodity in interstate commerce."  7 U.S.C. § 13(a)(2).  Notably, it does not prohibit a sale at a manipulated price, but rather, the manipulation itself.  The manipulated price alleged by the government could not have been achieved by one transaction.  The increase in price was accomplished through a series of transactions which had the cumulative effect of increasing the price of TET propane.  None of the transactions stands alone as a manipulation.  Since it is the transactions' cumulative effect that is illegal, they must be charged cumulatively.

Defendants also argue that the government has charged them for the same scheme twice by bringing counts Two through Twelve based on the price for individual transactions as well as counts

Thirteen through Seventeen, which allege manipulation of the OPIS index price.  The OPIS index price is determined by a third-party and is derived by looking at all contracts for the day, including defendants'.  The communication of the OPIS index price is completely outside of defendants' control.  The use of their transactions by a third-party to calculate an index which is then communicated to other third-parties cannot be used to exponentially increase their criminal exposure. The ripple effect of such a charging method is literally incalculable.  The OPIS index price counts are multiplicitous of the other manipulation counts and must be dismissed.

Defendants also argue that the two cornering charges are multiplicitous.  The government defends the indictment by stating that BP had the market cornered on February 25th and then continued to purchase propane until the 27th.  These additional purchases, according to the government, indicate that BP needed to reacquire control over the propane market.  This argument fails for the same reasons as the one provided in support of the manipulation counts.  Cornering a market will usually require many purchases, and they must be considered together in order to determine whether a corner actually occurred.  Since it is the interaction of multiple transactions that creates a corner, the transactions must be considered together in charging a corner.  One of the cornering counts would have to be dismissed because it is multiplicitous.

### E.  WIRE FRAUD COUNTS

Counts Twenty through Twenty-Six are wire fraud charges.  The seven charges are for seven different wire transfers made to BP by various counterparties in order to purchase February 2004 TET propane at the allegedly artificial price.  A conviction for wire fraud requires proof of a "scheme or artifice to defraud."  *U.S. v. Rajwani*, 476 F.3d 243, 247 (5th Cir. 2007), modified on other grounds, 479 F.3d 904 (5th Cir. 2007).  To prove a scheme to defraud, the government must show

fraudulent activity. *U.S. v. Stephens*, 571 F.3d 401, 404 (5th Cir. 2009). Activity is only fraudulent if defendants made a misrepresentation of material fact. *Neder v. U.S.*, 527 U.S. 1, 25, 119 S. Ct. 1827 (1999). While the government focuses almost exclusively on defendants' intent to increase the price of TET propane, it fails to allege even a single misrepresentation of material fact. The intent of defendants is largely irrelevant if they did not employ illegal means to achieve their intent. The absence of any allegations of misrepresentation is fatal to the government's wire fraud counts, and they must be dismissed.

## F.   CONSPIRACY

Count One charges defendants with a conspiracy to corner the TET propane market and manipulate the price of February 2004 TET propane. However, the facts alleged in the superceding indictment are insufficient to charge defendants with either manipulation or cornering. Since the facts alleged do not clearly violate the CEA, the conspiracy charge must be dismissed as well.

## IV.  CONCLUSION

The court's dismissal of the superceding indictment should not be taken as condoning the defendants' alleged actions in this case. Nor should it be considered a statement regarding the propriety of such profiteering in the marketplace. The court is not an arbiter of morality, economics, or corporate conduct. Rather, it is an arbiter of the law. The court is sympathetic to the government's desire to discourage the types of behavior alleged here, but its ability to do so is currently limited by a confusing and incomplete statutory and common-law regime. Until such time as Congress or a higher court speaks more clearly regarding the trading activities alleged here, it is the finding of this court that they do not violate the CEA as alleged in the superceding indictment.

Defendants' motions to dismiss the superceding indictment (Dkts. 257, 259, 260, and 261) are GRANTED.   All other pending motions are DENIED AS MOOT, and the superceding indictment is DISMISSED.

Signed at Houston, Texas on September 17, 2009.

Gray H. Miller
United States District Judge